Good morning, and may it please the court, Drew Legando for the appellant, the plaintiff below, Jacob Riegelsberger. You know, I was struck this morning watching the preceding arguments that this court was dealing with some lofty issues, abortion rights, and multi-million dollar punitive damage verdict, and I feared that this appeal may seem a little humdrum. And then my second thought was, this appeal raises a question essential in every court across the country within this circuit, which is the enforcement of principles of fair play in our civil justice system. The essential question in this case, in this appeal, in my view, is whether Air Evac, the defendant below, the appellee here, should have been equitably stopped from raising what we call a reverse misclassification defense under the Fair Labor Standards Act. It should be noted, no court that we have ever found, and I practice a lot in this area, has ever allowed a reverse misclassification defense. But they have described them as a defense in which the company classified, as a matter of fact, and in this instance, in the written employment offer letter, the position as one that was not exempt from federal wage and hour laws, and that is explicit in the record here. You said the word explicit. I read it, every time I read it, I hesitate because it's just contradictory. Do you agree it's contradictory, the sentence? I think the sentence is not contradictory, it is mistaken, in that the first two parts of that sentence are in perfect harmony. It says this position is considered non-exempt under federal wage and hour law. If we take that clause, and the defense here is it is exempt, I think it's easy to see why the defense should be a stop. The second clause is, which means you will be paid overtime, or you will be eligible for overtime. That's also consistent. Well, of course, in fairness, don't you have to take everything after the comma together? Well, I was going to do that, your honor. No, you'd stop there. Go ahead. Because if we take it for overtime for hours worked in excess of 84, I think it all goes together. Go ahead. So if it does go together, then it is misleading in its mistake, which is it purports to define what federal wage and hour law requires for non-exempt employees' overtime. It then defines the number of hours after which one would receive overtime incorrectly. In fact, that's precisely what occurred in this case. If you look at the Rigelsberger affidavit in the record, he says, I was under the impression that I would be protected by federal wage and hour law, and in fact, that I would receive overtime. It's only when I discovered that the 84-hour every two-week overtime pay policy was probably not right, and it took contacting a wage and hour lawyer to find out whether it was or was not, I think the record doesn't show that any layperson would know that. I don't think the district court finds that a layperson would know that. So counsel, isn't the question really whether that erroneous information together with the maybe confusing information would have put them on notice that they needed to make further inquiry? Well, I'm not sure that equitable estoppel under this circuit's law requires further inquiry. It's what would a reasonable person have understood the statement to have meant, and were they misled by it, and did they rely upon it. And all of those elements are present in this record. I don't know that we have a system which says, if your employer, in this case, a large, reputable company, employs lots of people, has its own HR department, puts forth HR manuals and the like, offers you a job and purports to classify that job or does classify that job and purports to explain what your overtime policies would be, that any layperson would say, well, I'm not sure. Is that really what federal law requires for overtime? Do I need to contact a lawyer to find out? And to be honest, if you Googled the overtime regulations as a layperson, we wouldn't do that. But if a layperson did, I'm not sure they'd figure it out. Is that in the record? No. Doesn't the reliance have to be reasonable? I'm going back to Judge Graza's point, which is that a layperson, I think, without legal training would look at the 84 hours and say, oh, that's the more specific. That's what governs me. I don't know many laypeople that would know what a non-exempt position for purposes of federal wage and hour law is. I had to think about it for a second, and I'm not a layperson. Exempt, non-exempt. Yeah. However, I think if you Googled am I exempt from this or non-exempt from this, you'd figure that out pretty quickly. But you agree there is a reasonable diligence standard? The Supreme Court, it's the Heckler case, acts like there's a reasonable diligence standard on your client? Yeah. I mean, the Heckler case is maybe not a great one to derive a broad principle of equitable estoppel law, given the facts of that case. In that instance, the written statement clearly said that the insured would discontinue receiving payments. And the plaintiff, the insured, alleged that he overheard a conversation amongst others, to which he was not a party, that called into question whether or not the written statement was accurate. At that point, I think it's fair for the court to say, look, if you received two conflicting pieces of information, you have this written letter which purports to define your benefits, and then you hear benefits coordinators discussing perhaps that's an error. At that point, you need to move forward. You can't just pick one official statement over the other. And here, all we have is the single written offer letter. There was never any discussion that was inconsistent with the classification of the position at non-exempt under federal wage and hour law. In fact, the deposition of the company showed that this was a consistent statement given in all written offer letters to anyone in the flight paramedic position. What this court has said in Berry v. Garza and Doody v. Norton-Elkoa are much closer to the scenario we have here. In that first case, the company had always portrayed itself as having an ERISA-funded Employee Welfare Benefits Plan, and then when the trustee of that plan brought suit because of underfunding, the company tried to disclaim that it was actually ERISA-governed and raised the defense of a lack of majority status. And this court affirmed estoppel of that defense. Similarly, in the Doody case... In that case, though, the person couldn't have known, couldn't have exercised reasonable diligence, right? Am I reading... If I'm thinking about the case correct... Well, I don't know that reasonable diligence would have factored in. Could not have acquired the truth with... We have words like that, don't we, in the opinion? That they could not have acquired the truth with reasonable diligence? Yeah, I mean, the truth that the company... Right. Majority? Yeah. Actually, I don't know that reasonable diligence really could factor into that case. Is that something that the member of the Welfare Benefits Plan could have ascertained, that there was no majority status? Probably not, whether they had exercised diligence or not. So I don't know that that factored in. Here, similarly, there is no opportunity to exercise diligence. The company has offered a position, they've classified the position, they've explained that overtime will be paid, and it's only their method of paying overtime which is unlawful, and it's the discovery of that illegality that results in this case. In the event that the court does not stop the defense, I'd like to turn to the authorities relied on by the district court, as well as by opposing counsel in its briefs, regarding whether or not an air ambulance company should be found to be a common carrier. As you know, the FLSA does not define common carrier, it simply refers in 213b3 to the Railway Labor Act, which unfortunately also does not define common carrier. This should come as no surprise. The term common carrier was used in English common law dating before the founding. I think Congress understood that judges, courts across the country know what common carriers are. In fact, virtually every state, including Missouri, which is where the company is based, so I think the parties in the court agreed we would proceed using Missouri's definition of the elements of a common carrier, they're consistent, which is indiscriminate transport of any member or definable segment of the public for hire. Someone raises their hand, says I'd like to be transported, I'm willing to pay your fee, and so you transport them. That's what common carriage operations are. There are a handful of, I'll call them authorities, although I'm not sure that the NMB decisions weigh on this court much at all, but I'd like to just run through them and show how distinguishable they are on their facts. Before you get there, there's a recent decision in the Fourth Circuit involving air evac on the common carrier. Could you address that? It's a Judge Wilkinson opinion in particular. Yes, I will. Is it the Cheatham case? It is. Cheatham. Cheatham. Okay. In fact, I'll deal with that case as well as the North Carolina case, MedTrans, AeroVac and MedTrans happen to be sister companies, which basically follow the same reasoning. I group them as the preemption cases. That does not really involve the intersection of the FLSA and the Railway Labor Act at all. Neither of those cases do. To the contrary, they involve the intersection of the Airline Deregulation Act and potentially other federal laws. The Airline Deregulation Act defines air carrier. It defines it broadly and it's in the statute. It says that an air carrier is, quote, a citizen of the United States undertaking by any means, indirectly or directly, to provide air transportation. That's 49 U.S.C. 4010282. There it's been defined. Then what the rest of the statute says is states shall not regulate any air carrier's services. There was an attempt by states because medical helicopter emergency transport is very expensive, tens of thousands of dollars in most instances. It's usually out of network. It's not covered by private insurance. There was an attempt by states to basically cap the amounts that could be charged and tether them either to Medicare reimbursement or state Medicaid reimbursement. These were offensive actions by MedTrans and AeroVac to try to declare those state regulations preempted. And so that's what the courts did there. And I think they're rightly decided cases is that if air carrier is defined so broadly to include anyone providing air transportation directly or indirectly, there's no question a helicopter is providing air transportation and has to have an FAA certificate. What about the flat statement in Cheatham, air ambulance companies fall squarely within the definition of common carriers, period? I'm sure you're familiar with the sentence. I am. If we went with you, would there be a conflict with us in the Fourth Circuit? I don't believe so because that's not the holding of the case. In fact, it's incredibly unnecessary dicta in that case. It was, I think, a novel argument. In fact, I think the preceding sentence of the opinion says this is a novel argument by the state in an attempt to try to wiggle out of the definition of air carrier. And the state, I think, was enterprising and saying, well, if they're not a common carrier, maybe they're not an air carrier at all, which really reverses the analysis. Air carrier is clearly as broad as it can get, any air transportation. Whereas common carrier has a well-known definition in state law. It was unnecessary for the Fourth Circuit to reach that decision. It's no part of either statute at issue in that case. They repeat that. And there was no record that it was developed. They repeat the common carrier several times, though, don't they? They do. I think it's in course of that discussion, but that was really a result of the state trying to develop a novel way to escape this definition. The court having, I suppose, to deal with the argument in some way, although it doesn't affect the holding of that case, the holding is it's preempted. And there was no record built in that case regarding the elements of common carrier. Perhaps if there had been, if the state was really going to make the case that air ambulances are not common carriers, and judge, here's all of our evidence for why, which is what we've done in this case, the court's dicta there may read quite differently. In fact, it might have said something like, whether or not it's a common carrier is irrelevant because we have a statutory definition which says any air transportation, we don't need to reach the issue. And that was probably a reaching too far by that court. So then is the real test whether they hold themselves out indiscriminately to a segment of the public on equal terms? Yes. And in exchange for a fare, which I think is critical. And on each of those elements, air evac and air ambulances are not common carriers. They only hold themselves out if it could even be called that. They're really relationship building with hospitals, 911 service operators in order to receive the dispatches. Isn't that the same as a regular ambulance in that regard? It may be. It may be that regular ambulances, and we looked across state law and ambulances in different states are sometimes defined as common carrier, sometimes by statute, sometimes by case law. And sometimes they are not. Again, sometimes by statute and sometimes by case law. And unfortunately, often it turns on a passenger within the ambulance raising the claim rather than the patient. And so it is, I would say, hard to draw a one-to-one parallel. And you're a do-gooder, Bob. I am. So I'll save the cases until I see if there's any questions by the court. Thanks so much. Thank you. Mr. Shinberg. May it please the court. The doctrine of equitable estoppel is not a game of gotcha. The doctrine can prevent ERIVAC from asserting its legal rights here only if it made a misrepresentation that plaintiff reasonably relied on to his detriment. But there is no evidence that plaintiff reasonably relied on the term non-exempt as used in his offer letter. In fact, the evidence is the opposite. The offer letter described non-exempt as meaning that plaintiff would only get overtime for hours worked over 84 in a two-week period. The non-exempt is wrong, though, right? It is. It's just plainly wrong. Of course, some of us would know that non-exempt is a legal term of art that doesn't match the description of it given in the offer letter. But there's no evidence that plaintiff knew the term of art or that it, or plaintiff knew that it didn't match the description of it in the offer letter. In fact, in his briefing, plaintiff admits that only a wage and hour lawyer would have known enough to understand that non-exempt had a different meaning and thereby become confused by the letter. And since plaintiff is not a wage and hour lawyer, that's an admission that he could not have been misled or otherwise relied on the term non-exempt in the letter. I do want to correct one thing. Counsel said that his client had an understanding that the term non-exempt meant that he had some kind of overtime rights. There's no evidence even of that understanding in the record. His declaration that's cited doesn't say anything about that. Well, now, you sent him a separate letter, right? The separate letter says the kind of overtime you get. So tell me if I don't get your argument. Doesn't your separate letter make clear about what the overtime rights are? There is several sources that should have put that the only evidence of what Mr. Reigelsberger's understanding is, is exactly as laid out in the letter, which says he's going to get overtime if he works in excess of 84 in a two-week period. That's it. There's no evidence he had any other standing. That's my real point. There's no evidence that he was even confused, much less misled. And even if he had known the term of art, even if he had known the term of art as referring to his eligibility for overtime under the FLSA, he couldn't have reasonably relied on the term because the full context of the sentence itself makes clear that Arivec wasn't going to treat him as non-exempt under the FLSA. If it was intending to treat him as non-exempt under the FLSA, it would have been talking about 40 hours in a week, not 84 hours in two weeks. So he couldn't have reasonably relied on it. And I believe Your Honor made the point earlier that even if he was confused, and there's no evidence he was even confused, then he needed to say, hey, I don't understand these things look contradictory. But he didn't do that. I understand why he didn't do that. Because he wasn't confused. Why wasn't he confused? Because he had no understanding whatsoever of the term non-exempt by itself. He only understood it to mean exactly as it was described, which is exactly what he got. And there's also no evidence that even if he had understood it at all and somehow avoided his obligation to check into it, there's no evidence that he relied on it in any way to his detriment. There's no evidence he accepted the job offer or worked certain hours or did anything else because he thought he'd be treated as non-exempt under the FLSA and therefore eligible for overtime based on a 40-hour week. To the contrary, Plaintiff admits in his briefing no reasonable person would have believed that he was going to get anything other than the overtime when he worked over 84 hours in a two-week period. In other words, there's no misunderstanding based on the letter. The use of the term non-exempt had no effect on Plaintiff. There's thus no basis in equity to a stop-error EVAC from showing that the Railway Labor Act exempts Plaintiff from the FLSA's overtime rules and the district court's equitable estoppel ruling should be affirmed. And by the way, it should be affirmed under any standard of review. But for the record, the proper standard of review here would be abuse of discretion. The court said so, this court said so, in Doody v. Norton Alcoa. And that's also the standard used in every other circuit. Plaintiff's argument for de novo review is based on Donaldson v. Burroughs, which as Judge Benton knows well, involved the narrow question of reviewing an order granting arbitration to a non-signatory based on equitable estoppel. But equitable estoppel in those cases involves a completely different set of factors having to do with the connection between the arbitration agreement itself and the non-signatory. That explains why Donaldson didn't mention Doody v. Norton Alcoa. And moreover, the issues in the two cases were obviously different because if they'd been the same, the Donaldson court could not have reached a different conclusion given the circuit rule against one panel overruling another. All that being said, the outcome of the equitable estoppel argument doesn't depend on any particular standard of review. Plaintiff has no evidence to support his argument. The legal right that plaintiff has tried but failed to avoid with his equitable estoppel argument is the overtime exemption under the Railway Labor Act. That right belongs to any common carrier by air. Courts and regulatory authorities are unanimous that air ambulance companies like Air Evac and Air Evac specifically in some of those cases are indeed common carriers by air. Counsel, in that regard, let me ask you, is there any significance to the fact that Air Evac's sister subsidiary, Reach, was operating as a non-exempt company and they do the same thing, same service? They were paying their employees overtime from working more than 40 hours in a week. That's not the same as saying that they were obligated to do that. All they notified Mr. Reigelsberger was that there was going to be a change, which is further evidence, of course, that he should have known that this was going to be a different deal. So they were voluntarily complying with the federal law that they were exempt from? There's no evidence in the record as to exactly why that was, but there is certainly nothing that affects Air Evac's ability to claim the RLA exemption. These unanimous authorities, it's not just that they're unanimous, which is significant, of course, but it's that they're correct based on a straightforward application of black letter common law definition of common carrier, a commercial enterprise that holds itself out to a definable segment of the public as willing to transport for a fee. Air Evac holds itself out to hospitals and emergency services providers and also to individuals, and it holds itself out as willing to transport sick and injured people for a fee when asked to by providers. Plaintiff has not cited a single decision holding than any air ambulance company on these facts or any other facts as not a common carrier and offers no authority either to support the three arguments that he does make, all of which boil down to pretending that the law requires something that it does not. First, plaintiff says Air Evac holds itself out only to hospitals and emergency services agencies and not to the injured people that it carries. But plaintiff cites no authority that being a common carrier requires that the marketing audience and the passengers be one and the same. Many common carriers don't carry people at all, so plaintiff is clearly wrong about that. Multiple decisions also reinforce that plaintiff is wrong about that. Courts already recognized the 2018 decision from the Fourth Circuit in Cheatham that a common carrier must hold itself out to a segment of the public where it held that Air Evac is in fact a common carrier, even though it relies only on referrals from medical providers. 2010 McKinley case, another federal court addressed and rejected plaintiff's argument squarely. Quote, the evidence establishes that defendant, sister company of Air Evac, indiscriminately markets and provides its services, air ambulance transportation of medical patients for a fee, to a definable segment of the public, hospitals and fire and police departments. It is therefore a common carrier by air. And the National Mediation Board has found similarly. Furthermore, plaintiff here on the issue of who Air Evac holds itself out to and does it satisfy that part of the test, plaintiff has ignored the district court's alternative ruling that Air Evac holds itself out also to individuals, and having failed to address that in that alternative basis in his briefing, plaintiff I think has waived the holding out issue. Well, the holding out issue is a little deeper than that, right, because you have members. They get protection against costs, but they don't get any guaranteed rides or anything, right? That's true. And they can't call directly in. That is also true. That is correct. That is correct. But the case law on holding out, we can look at the Voyager case and other cases. Case law on holding out is simply, sometimes just being in the business is enough to say you're holding out, and they clearly do hold itself out and they advertise to people, presumably hoping that they will sign up and potentially to increase Air Evac's business. That would certainly satisfy the holding out aspect. Plaintiff's second argument is that Air Evac just isn't going to take anybody who's willing to pay. It has its own criteria, as they say, about who it will decide to transport. It is true that Air Evac is not willing to just carry anybody who's willing to pay. It's an air ambulance company. But it's also true that the law is quite clear that a common carrier can define its niche as it sees fit and turn away passengers in freight that don't fit those parameters. Moreover, it's not true that Air Evac determines which sick people or injured people it's going to transport. The record evidence shows that the requesting hospital or emergency services agency makes the final decision. Third argument plaintiff has made in his briefs is that Air Evac can't be a common carrier because passengers do not make payment arrangements before they are transported. What the law actually requires is only that Air Evac charges a fee for its services. The undisputed record evidence is that Air Evac charges a fee for its services. Plaintiff doesn't cite any authority to support the argument that a passenger has to pay before the transport. In this particular circumstance, that would be an odd requirement. Of course, that's one way you market to your 2.7 members as part of what will be paid for, right? They're getting something, aren't they? Those people will have no out-of-pocket costs. Deductible, in effect? There's often insurance coverage. It's a deductible sort of approach, right? That's correct. When it comes down to it, go ahead. The authority, though, is to the contrary. In Medtrans v. Benton, federal district court addressed in a rejected justice argument finding about an air ambulance company, quote, that compensation may come from third parties is irrelevant, and the mere fact that plaintiff doesn't collect tickets at the boarding gate doesn't mean it's not a common carrier. Plaintiff's final broadside, attempting to avoid the exemption for common carriers, is to attack the unanimous authority that's aligned against them. He has no choice. But plaintiffs attempt to distinguish numerous cases, including Cheatham, because they find air ambulance companies to be common carriers in the context of the Airline Deregulation Act rather than the Railway Labor Act. That's his argument, but that's a distinction without a difference. Courts analyzing both statutes ultimately look to the common law definition of a common carrier, and that's not dicta either. That was the state of West Virginia's argument in Cheatham. If we really want to track the airline deregulation definitions, I think I did so in the briefs, it's not dicta because that was West Virginia's argument. They're not entitled to ADA protection because they're not a common carrier. Fourth Circuit says, yes, they are a common carrier. That's necessary to the decision. Plaintiff also has attacked the opinions from the U.S. Department of Labor and the National Mediation Board as not entitled to any deference. Frankly, given the unanimity and clarity of the court decisions, I don't think regulatory is as important here as it might otherwise be, but the assertion is simply wrong as a matter of law. This court has been clear, including in the Hemminghouse case cited by plaintiff, that the agency opinion letters are indeed entitled to skid more deference because, of course, they constitute a body of experience and informed judgment. Moreover, the weight to be given such opinions depends, among other things, on their consistency with earlier and later pronouncements and their reasoning. And here the opinion letters are consistent with each other and with the courts, both before and after they were issued. They're consistent not only in overall conclusion, but also with regard to analyzing the specific arguments, including rejecting arguments raised by plaintiff here. And the opinions in cases are all consistent because they are all doing the same thing, simply applying black-letter law of common carriers to find that air ambulance companies like Air Evac are, in fact, common carriers. The Fifth Circuit in Thibodeau specifically recognized that the NMB board uses the same definition of common carriers. The Fourth Circuit in Cheatham cited the NMB's opinion in Tri-State Care Flight and the NMB's Southern Air Transport opinion, upon which Tri-State and the other air ambulance opinion letters rely, contains a thorough analysis with citations to court common law. Plaintiff here is not just asking for summary judgment to be reversed. His rationales for reversal, if adopted, would undo decades of uniform law about air ambulances. The facts show here that under the common law, Air Evac is, in fact, a common carrier. That means it's a common carrier under the Railway Labor Act. That means it's exempt from the Fair Labor Standards Act. And because there's also no basis in equity to stop Air Evac from asserting that exemption, the district court was correct to grant summary judgment. And Air Evac asks that the district court decision be affirmed on all issues. Thank you. If there's no further questions. Thank you, Mr. Schenberg. Back to you, Mr. Legato. Let me address the so-called mountain of authority we're up against. 1980 Southern Air Transport NMB decision hired out flights to Puerto Rico, common carrier. 1981 Evergreen Helicopters hired out flights for crews to go into the logging industry. 1985 Papillon Helicopters hired out tours of the Hawaiian Islands. 1999 Rocky Mountain Holdings hired out air taxi services. 2000 Slavens versus Scenic Aviation, which is the Tenth Circuit case, hired out for a charter service and hired out for air cargo. 2014 Tri-State Care Flight hired out by individual members of the public. This is why being an air ambulance does not, per se, make one a common carrier. It's why there's a dozen decisions, because you have to look at the individual air ambulance company and evaluate, look, is all that it does is provides medical services? Because if so, it's this case. None of the prior authorities did that. They all had ancillary services, or their medical evacuations were ancillary to their primary service, which was hiring out for one of these various things, touring the Hawaiian Islands, flying down to Puerto Rico. Counsel, your time has expired. Okay. So I would just, I'd appreciate the court reviewing the list of cases in the reply brief, which I think dispenses with the notion that they provide any authority that would govern this case. Thank you so much. Thank you for the argument. Case number 19-1414 is submitted for decision by the court. Ms. Grupe.